**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3678
_____

H. L., A MINOR, INDIVIDUALLY AND BY AND THROUGH HER PARENTS,
GEORGE L. AND SUSAN F., OF DOWNINGTOWN, PA,
Appellant

v.

DOWNINGTOWN AREA SCHOOL DISTRICT
_____

No. 14-3727
_____

H. L., A MINOR, INDIVIDUALLY AND BY AND THROUGH HER PARENTS,
GEORGE L. AND SUSAN F., OF DOWINGTOWN, PA

v.

DOWNINGTOWN AREA SCHOOL DISTRICT,
Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 2-12-cv-04595)
District Judge:  Honorable C. Darnell Jones, II
_____

Submitted Under Third Circuit LAR 34.1(a)
April 24, 2015
_____

Before: CHAGARES, JORDAN and BARRY, <u>Circuit Judges</u>

(Opinion Filed: June 11, 2015)

———————

OPINION[*]

———————

BARRY, <u>Circuit Judge</u>

H.L. seeks reimbursement for her tuition at a "nonpublic school"[1] after her public school district, the Downingtown Area School District, purportedly failed to provide her with a free appropriate public education ("FAPE") in the least restrictive environment ("LRE") appropriate for her, in contravention of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* A hearing officer concluded that while the District had failed to comply with the IDEA, the school at which H.L. had been enrolled by her parents was not an "appropriate" placement warranting tuition reimbursement. The District Court affirmed. We, too, will affirm.

I.

A.

In May 2010, when she was eight years old, H.L. was identified as having specific learning disabilities in reading fluency, reading comprehension, and written language. In June 2010, the District proposed an individualized education program ("IEP") to address her needs. H.L.'s parents rejected the IEP, and enrolled her instead at the Kimberton Waldorf School, a nonpublic school in Phoenixville, Pennsylvania, for the 2010-2011

———————

[*] This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] The parties stipulated that Pennsylvania has recognized the school "as a nonpublic school" that "is not licensed either as a private academic school or as a school for students with disabilities." (App. 111a.)

school year. Kimberton offers a curriculum "taught through the prism of creative thinking," and, believing that children from grades one to eight "learn best through strong experiences that stir the emotions," it "present[s] subjects pictorially and dramatically, and by cultivating their imaginative capacities." (App. 112a.) The District paid H.L.'s 2010-2011 tuition pursuant to a settlement agreement with her parents.

During the 2010-2011 school year, H.L. received supplemental reading and writing instruction individually or in a small group for 30-40 minutes two to three times per week. This instruction was delivered by a certified reading specialist from the Chester County Intermediate Unit, one of Pennsylvania's regional educational agencies, which provides these and other services in nonpublic schools.

In May and June 2011, the District reevaluated H.L. and prepared another IEP in anticipation of the upcoming school year. The District proposed that H.L. return to her former school, where she would receive pull-out language arts instruction for 90 minutes per school day and spend the remaining five hours of the day in a regular classroom. H.L.'s parents rejected the IEP, and H.L. remained at Kimberton for 2011-2012, her fourth grade year, at her parents' expense. There, she received supplemental instruction in a small group for 40 minutes twice per week and individual instruction for 30 minutes once per week, along with occasional 30-minute individual sessions. H.L.'s parents preferred Kimberton's "process-oriented education," and declined to remove her from a program they viewed as successful and less restrictive to send her back to a setting in which she had not excelled and which they believed was more restrictive. (App. 187a.)

3

H.L.'s parents filed an administrative due process complaint seeking reimbursement for her 2011-2012 tuition. The matter was submitted on a stipulated record to a Special Education Hearing Officer, who, in a May 15, 2012 decision, concluded that, based on the evidence before him,[2] the District failed to give "serious consideration" to using supplementary aids and services to keep H.L. in regular classes, and therefore failed to offer her a FAPE within the LRE for the 2011-2012 school year. However, he declined to order tuition reimbursement, finding that Kimberton was not an "appropriate" placement because the record was "devoid of any reliable indicator that [it had] addressed [H.L.'s] serious language arts deficiencies appropriately," and the "inadequacies of [Kimberton's] services are far more fundamental than a mere deviation from the way things are done in the public school." (App. 81a; App. 83a.)

B.

H.L., through her parents, appealed to the District Court. The District also challenged the decision, insofar as the Hearing Officer had found that it failed to provide a FAPE in the least restrictive environment appropriate for H.L. With leave, the parties supplemented the record, H.L. with an independent educational evaluation report prepared in June 2012, a bar graph comparing 2010 and 2012 test results, and a "consultation report" by Dr. Matthew Ferchalk, a school psychologist. Dr. Ferchalk

---

[2] This evidence consisted of the parties' stipulations of fact; their settlement agreement for the 2010-2011 school year; the District's 2011 reevaluation report, IEP, and Notice of Recommended Educational Placement ("NOREP"); an email from H.L.'s parents to the District expressing their concerns with the IEP and NOREP; and the *curriculum vitae* of H.L.'s father, who holds a doctorate in psychology and is the chief operating officer of an agency serving individuals with, *inter alia*, developmental disabilities.

4

opined, in short, that inclusion should be considered before attempting a more restrictive setting, although it wasn't clear from the material provided to him what supports would be necessary to facilitate inclusion, and that H.L. had shown progress based on her testing results, grades, and reports from her parents and teachers.

The District supplemented the record with an e-mail and attached memorandum from state Department of Education personnel providing guidance on how the LRE section of IEPs was to be completed, along with opening and rebuttal expert reports by Dr. Monica McHale-Small, who opined that there was little reliable indication of H.L. making progress in reading and writing, and that her needs could not be addressed in a regular classroom.

On the parties' motions for judgment on the supplemented administrative record, the District Court upheld the Hearing Officer's decision in all respects, agreeing that the District had not countered the evidence tending to show that it failed to adequately consider greater inclusion. It also agreed, however, that Kimberton was an inappropriate placement, as, in the Court's view, the supplemental evidence did not overcome the Hearing Officer's justified concern that H.L. had failed to make meaningful progress. Both sides have appealed.

## II.[3]

"When considering an appeal from a state administrative decision under the IDEA, district courts apply a nontraditional standard of review, sometimes referred to as

---

[3] The District Court had jurisdiction under 20 U.S.C. § 1415(i). We have jurisdiction under 28 U.S.C. § 1291.

'modified de novo' review," under which they accord "'due weight' and deference to the findings in the administrative proceedings," with factual findings to be considered *prima facie* correct and an explanation required if the court departs from them. *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010) (citation omitted). The court is "authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate," including tuition reimbursement. *Id.*; *see also Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 430 (3d Cir. 2013) ("Although the District Court must make its own findings by a preponderance of the evidence, it is also required to afford due weight to the factual findings of the hearing officer."). We review the District Court's findings of fact for clear error and its legal conclusions and the legal standards it applies *de novo*. *D.S.*, 602 F.3d at 564.

III.

H.L. argues that her academic, social, emotional, and behavioral gains show that Kimberton was an appropriate placement. The District, cross-appealing, challenges the conclusion that it denied H.L. a FAPE in the LRE. We are not persuaded by either party's position.

A.

Tuition reimbursement is only available for a parent's unilateral placement of a child in a private school if "'(1) the court determines the student's IEP is inappropriate and (2) the student demonstrates that the private placement he seeks is proper.'" *Lauren W. v. DeFlaminis*, 480 F.3d 259, 276 (3d Cir. 2007) (citation omitted). Stated differently,

6

parents are entitled to tuition reimbursement only if a court concludes, first, "that the public placement violated [the] IDEA." *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993). We start, then, with the District's argument that it complied with the IDEA because it in fact offered a FAPE in the LRE, even if it insufficiently documented the more inclusive options it considered.

The IDEA's LRE mandate provides that "[t]o the maximum extent appropriate," a child with disabilities is to be educated with non-disabled children, and "special classes, separate schooling, or other removal of [the child] from the regular education environment" should "occur[] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). In short, a student with disabilities must be placed "in the least restrictive environment that will provide the child with a meaningful educational benefit." *D.S.*, 602 F.3d at 556-57.

Whether a school district complied with the LRE requirement depends first on "'whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily.'" *Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1215 (3d Cir. 1993) (citation omitted). This, in turn, is assessed by "'(1) the steps the school district has taken to accommodate the child in a regular classroom; (2) the child's ability to receive an educational benefit from regular education; and (3) the effect the disabled child's presence has on the regular classroom.'" *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006) (citation omitted). If

7

education in the regular classroom cannot be achieved satisfactorily, we ask "whether the school has included the child in school programs with nondisabled children to the maximum extent appropriate." *Oberti*, 995 F.2d at 1218.

School districts must make available a "'continuum of placements'" to meet disabled children's needs, and, in seeking to accommodate the child in the regular classroom, they must "'consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction.'" *Id.* at 1216 (citations omitted); *see also* 34 C.F.R. § 300.115(a). As we noted in *Oberti*, if a school "has given no serious consideration to including the child in a regular class with such supplementary aids and services and to modifying the regular curriculum to accommodate the child, then it has most likely violated" the LRE requirement. 995 F.2d at 1216.

Here, the IEP and NOREP provide no insight into the options the District considered before it determined that H.L. needed pull-out language arts instruction for 90 minutes a day. Indeed, there is no indication in the record of how the District actually approached the LRE issue, and only limited evidence in the supplemented record of what options may have been available.[4] Under these circumstances, it is impossible to assess

---

[4] Dr. McHale-Small opined that push-in reading instruction by a special education teacher would not be feasible, but discussed no other possibilities. Dr. Ferchalk, on the other hand, opined that "[t]here [was] nothing . . . to suggest" that the goals and specially-designed instructions in the District's IEP "could not be carried out within the regular education environment," and that with "team teaching, differentiation, or flexible grouping, [H.L.'s] classroom teacher with the support of the special education professional could devise a plan of action that would carry out the IEP within the classroom setting." (App. 102a.)

whether H.L. could have been educated satisfactorily in a regular classroom with assistance, or what steps, if any, the District took to accommodate H.L. in a classroom.

The Hearing Officer and District Court did not, in reaching their decisions, improperly shift the burden of persuasion. H.L.'s parents described to the District the inclusionary Kimberton program and reported that H.L.'s "needs include . . . continued reading and math support, but in the context of normal developing peers with age appropriate materials and curriculum." (App. 124a.) However, the IEP did not address why inclusion on the same scale as Kimberton was inadvisable or why the specially-designed instructions it proposed could not be fully implemented in the regular classroom. The NOREP contained a single line rejecting full inclusion as not appropriate for H.L.'s needs. This was clearly insufficient, and H.L. has shown that it was more likely than not that the District failed to consider the "whole range" or "continuum" of possible placements as mandated by the IDEA.

Indeed, even before the District Court, when it was the District's burden to prove that the Hearing Officer erred on this point, *see Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2010), the District provided no evidence of what steps it took towards full inclusion. The closest candidate is Dr. McHale-Small's rejection, in her expert reports, of push-in language arts instruction – itself only one option. On this record, the District failed to provide a FAPE in the LRE, as measured by the *Oberti* test; the finding that the IEP was inappropriate on this basis was not clearly erroneous.

We likewise reject the assertion that the decisions below improperly conflated the

FAPE and LRE requirements. The IDEA requires that a compliant IEP deliver both: a FAPE in the least restrictive environment that will confer "a meaningful educational benefit." *D.S.*, 602 F.3d at 556-57. Again, on this record there is no indication of compliance with the LRE mandate, and so the IEP was inappropriate, regardless of how the relationship between the FAPE and LRE requirements is characterized.

To the extent that the District contends it was error to base a finding of a substantive FAPE denial on a procedural flaw—the failure to document consideration of more inclusive options—this argument fails as well. The issue was not what the IEP said or did not say for its own sake; the issue is whether there was evidence that a critical part of implementing the LRE mandate had been carried out, even when one looks beyond the IEP itself to the full record. The failure to do so was a substantive shortcoming in the IEP, and in the District's showing more generally. *See id.* at 565 ("The content of an IEP as such does not implicate the IDEA's procedural requirements for content is concerned with the IEP's substance; i.e., whether the IEP 'reasonably [is] calculated to enable the child to receive educational benefits.'" (alteration in original; citation omitted)). Without evidence, what the District is asking us to do – assess whether its proposal was *in fact* the least restrictive environment appropriate for H.L. – must be rejected.[5]

B.

_____

[5] The District suggests that H.L.'s supplemental instruction at Kimberton shows that she needed pull-out instruction. But the record does not reveal how, if at all, Kimberton's pull-out instruction compares to that proposed by the District. Moreover, the District challenges Kimberton's program as inappropriate, and we agree. On these facts, then, little can be drawn from the nature of Kimberton's service delivery with respect to the District's compliance with the LRE mandate.

10

The shortcomings in the District's proposal do not, on their own, require an award of tuition reimbursement: Kimberton must also be a "proper" placement. *Lauren W.*, 480 F.3d at 276. A placement qualifies when it is "appropriate," in that it "provides 'significant learning' and confers 'meaningful benefit,'" and is provided in the LRE. *Id.* (quoting *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 248 (3d Cir. 1999)); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 240-44, 246-47 (2009). What constitutes a "benefit" depends on the child's potential. *Ridgewood*, 172 F.3d at 247-49 & n.8.

Both sides relied on evidence of H.L.'s progress (or lack thereof) at Kimberton as a proxy for whether it was a proper placement. H.L. pointed to her academic, emotional, social, and behavioral gains, while the District relied on the results of tests administered to her, arguing that they demonstrated that her academic progress, especially in reading and writing, was minimal. The District Court credited the evidence submitted by the District over that submitted by H.L., a finding we do not view as clearly erroneous. In particular, Dr. McHale-Small opined that in most categories, results of the tests given to H.L. were not comparable to each other, undermining her parents' claim that she made "substantial academic gains." (App. 93a.) She further opined that even as to measures that *were* comparable, the results properly interpreted demonstrated that H.L.'s progress was minimal.

H.L. argues that evidence of her non-academic progress, including evidence presented through her father, was improperly disregarded. We disagree. The Hearing Officer, on the record before him, and the District Court, on the supplemented record

11

before it, did not discount H.L.'s evidence or apply an incorrect standard, but merely credited the District's evidence over H.L.'s. Moreover, the Hearing Officer and the Court could properly limit the weight accorded the opinion of H.L.'s father that she had made meaningful progress. It is unclear how Dr. L.'s education and his experience "as a doctorate-level psychologist who operates a school for disabled children" (Opening Br. 20), qualified him to opine on the topic of H.L.'s educational progress. Indeed, the parties stipulated that he "is neither a licensed clinical nor a certified school psychologist in Pennsylvania, and has not tested or assessed [H.L.] in a manner consistent with either licensed clinical or certified school practice." (App. 114a.) At minimum, the Court was entitled to credit Dr. McHale-Small's opinion over Dr. L.'s on the issue, and we discern no clear error in its doing so.

In short, the District Court's finding that H.L. made little progress in her areas of need while at Kimberton does not leave us with "'a definite and firm conviction that a mistake has been committed.'" *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (quoting *Oberti*, 995 F.2d at 1204). Instead, it was well-supported in the record. As such, we decline to disturb the Court's conclusion, based on this finding, that Kimberton was not a proper placement.

IV.[6]

For the reasons set forth above, we will affirm the order of the District Court.

---

[6] Before the District Court, H.L. also argued that tuition reimbursement was warranted under the Americans with Disabilities Act and the Rehabilitation Act. She makes no such argument on appeal, and we, therefore, do not reach the issue.