(Slip Opinion)

# Reconsidering the Authority of the Department of Veterans Affairs to Provide Abortion Services

The Department of Veterans Affairs may not provide abortion services under any provision of chapter 17 of title 38 of the U.S. Code.

The portions of our opinion in *Intergovernmental Immunity for the Department of Veterans Affairs and Its Employees When Providing Certain Abortion Services*, 46 Op. O.L.C. __ (Sept. 21, 2022), that held to the contrary are withdrawn and superseded by this opinion.

December 18, 2025

MEMORANDUM OPINION FOR THE SECRETARY
DEPARTMENT OF VETERANS AFFAIRS

In 2022, this Office advised that federal law authorizes the Department of Veterans Affairs ("VA") and its employees to provide abortion services. *See Intergovernmental Immunity for the Department of Veterans Affairs and Its Employees When Providing Certain Abortion Services*, 46 Op. O.L.C. __, at *4 (Sept. 21, 2022) ("*Abortion Services*"). Our opinion, which memorialized and expanded on earlier advice, interpreted federal law as conferring "broad discretion" on the Secretary of Veterans Affairs in this area. *Id.* at *9 (citation omitted). And its logic suggested the unprecedented conclusion that VA could lawfully provide taxpayer-funded abortions for any reason and at any stage of pregnancy—including after fetal viability and until birth. *See id.* at *7–9.

In response to our advice, VA issued an interim final rule that departed from longstanding practice. For the first time, it expressly authorized VA to provide abortions to veterans and certain other VA beneficiaries as part of its medical authority under chapter 17 of title 38 of the U.S. Code. *See* Reproductive Health Services, 87 Fed. Reg. 55,287, 55,296 (Sept. 9, 2022) (codified as amended at 38 C.F.R. § 17.38(c)(1)(i)–(ii)). It also enabled VA to provide abortion counseling. *See id.* at 55,288. Although VA exercised its newfound authority to provide abortions sparingly, the scope of the rule and our Office's subsequent opinion supporting it swept more broadly. *See Abortion Services* at *9.

In August 2025, VA proposed a new rule "to reinstate the full exclusion on abortions and abortion counseling from the medical benefits package, which was removed in 2022." Reproductive Health Services, 90 Fed. Reg.

36,415, 36,415 (Aug. 4, 2025). That proposed rule observed that the 2022 interim final rule "was legally questionable." *Id.* at 36,416. You have now asked us to reconsider whether federal law authorizes VA to provide abortion services under any provision of chapter 17 of title 38 of the U.S. Code. It does not, so we withdraw in part our prior opinion.[1]

## I.

Federal law requires VA to "furnish" qualifying veterans with "hospital care and medical services which the Secretary determines to be needed." 38 U.S.C. § 1710(a)(1). VA implements this treatment scheme through regulations defining the contours of its "medical benefits package." 38 C.F.R. § 17.38(a). VA also "is authorized to provide medical care" to certain spouses, children, and caregivers of veterans as part of the Civilian Health and Medical Program of the Department of Veterans Affairs—commonly known as "CHAMPVA" beneficiaries. *See* 38 U.S.C. § 1781(a). Medical care provided to CHAMPVA beneficiaries must be provided "in the same or similar manner," and is "subject to the same or similar limitations," as medical care furnished to family members of active-duty personnel and others under the Department of War's TRICARE (Select) program. *Id.* § 1781(b). VA regulations implementing CHAMPVA specifically limit the provision of abortion. *See* 38 C.F.R. § 17.272(a)(58).

In 1992, Congress amended title 38 "to improve health care services for women veterans" and for other purposes. Veterans Health Care Act of 1992, Pub. L. No. 102-585, 106 Stat. 4943, 4943 ("VHCA"). With respect to VA's authority to furnish hospital care and medical services, section 106 of the VHCA made clear that VA could provide "[g]eneral reproductive health care" to women. *Id.* § 106(a)(3), 106 Stat. at 4947. But Congress carved out from that authority "infertility services, abortions, or pregnancy care (including prenatal and delivery care), except for such care relating to a pregnancy that is complicated or in which the risks of complication are increased by a service-connected condition." *Id.* This

---

[1] Our earlier opinion also offered advice about federal immunity derived from the Supremacy Clause. *See Abortion Services* at *1–4, *9–10. While we now reconsider VA's statutory authority to provide abortions, you did not ask us to, and therefore we do not, reconsider the portions of the opinion relating to intergovernmental immunity.

statutory language thus barred VA's provision of abortions and limited its provision of pregnancy care to situations that were "complicated."

Consistent with section 106 of the VHCA, VA's regulations for decades provided that "the 'medical benefits package' does not include . . . [a]bortions and abortion counseling" for veterans. 38 C.F.R. § 17.38(c) (2008); *accord id.* (2011); *id.* (2019); *id.* (2021); *see also* 87 Fed. Reg. at 55,288 (explaining that the abortion exclusion had existed since 1999, the year during which VA first established the medical benefits package). VA regulations applicable to CHAMPVA beneficiaries likewise consistently excluded abortion services and clarified that physicians could perform an abortion only if they "certifie[d] that the life of the mother would be endangered if the fetus were carried to term." 38 C.F.R. § 17.272(a)(67) (2008); *see also id.* § 17.272(a)(68) (excluding "[a]bortion counseling"); *accord id.* § 17.272(a)(67)–(68) (2022). That life-of-the-mother exception was substantially similar to federal law governing TRICARE, which prohibits the use of Department of War funds for abortions "except where the life of the mother would be endangered if the fetus were carried to term." 10 U.S.C. § 1093(a).[2]

VA changed course in 2022. When promulgating an interim final rule, VA explained that it was

> amend[ing] its medical regulations to remove the exclusion on abortion counseling and establish exceptions to the exclusion on abortions in the medical benefits package for veterans who receive care set forth in that package, and to remove the exclusion on abortion counseling and expand the exceptions to the exclusion on abortions for [CHAMPVA] beneficiaries.

---

[2] VA had never understood the VHCA or its regulations "to prohibit providing care to pregnant women in life-threatening circumstances, including treatment for ectopic pregnancies or miscarriages, which were covered under the VA's medical benefits package prior to the 2022 [regulation]." 90 Fed. Reg. at 36,416. VA's 2025 proposed rule "make[s] clear that the exclusion for abortion [for CHAMPVA beneficiaries] does not apply 'when a physician certifies that the life of the mother would be endangered if the fetus were carried to term.'" *Id.* We conclude that VA's longstanding approach to life-saving medical interventions accords with the plain meaning of "abortion," as informed by common legal and medical usage. *See* Nicholas Colgrove, *Defining 'Abortion': A Call for Clarity*, Theoretical Med. & Bioethics, No. 46, 137–69 (2025). Nothing in our opinion today prohibits VA from providing care to pregnant women in life-threatening circumstances.

87 Fed. Reg. at 55,287. VA left no doubt that provision of such services would have been impermissible under its then-existing regulations: "Unless VA remove[d] its existing prohibitions on abortion-related care," it said, the Department would be unable to provide the specified services. *Id.* at 55,288.

VA's medical benefits package was thus amended to include express authorization for abortions when "[t]he life or the health of the pregnant veteran would be endangered if the pregnancy were carried to term" or "[t]he pregnancy is the result of an act of rape or incest." 38 C.F.R. § 17.38(c)(1)(i)–(ii) (2022); *accord id.* (2023). VA's regulations for CHAMPVA beneficiaries were also amended to allow for abortion in cases where "[t]he life or the health of the pregnant beneficiary would be endangered if the pregnancy were carried to term" and where "[t]he pregnancy is the result of an act of rape or incest." *Id.* § 17.272(a)(58) (2022); *accord id.* (2024).

Before VA issued its interim final rule, we considered, among other questions, whether the rule was a lawful exercise of VA's authority. *See Abortion Services* at *1. We concluded that it was and published an opinion that the new VA rule was consistent with the VHCA's authorization of general reproductive health care for veterans under section 106. *See id.* at *1, *10. We explained that "[t]he text of section 106 specifies that its exclusions" for abortions "only limit VA's authority 'under [that] section,'" but we believed that "[t]hose exclusions do 'not limit VA's authority to provide care under any other provision of law,'" such as 38 U.S.C. § 1710. *Id.* at *7 (second alteration in original) (citations omitted). Under our interpretation of VA authority, there seemed to be no limit to VA's discretion for determining that abortion was "needed" for veterans. *See id.* at *9 (citing 38 U.S.C. § 1710(a)(1)–(3)). Although we were focused on whether VA's regulations were reasonable exercises of the Secretary's "broad discretion," *id.*, our opinion's logic suggested that VA could lawfully provide abortions for nearly any reason and at any stage of pregnancy—including after fetal viability and until birth—even in states that had otherwise enacted laws against abortion, *see id.* at *1, *4–7.

VA has now retreated from the 2022 interim final rule and proposed a new rule restoring VA's medical benefits package and CHAMPVA coverage to their pre-2022 states. *See* 90 Fed. Reg. at 36,416–17. Nevertheless, VA has continued to express doubt about the legal basis for its 2022

interim final rule and the scope of VA's legal authority. *See id.* at 36,416. You have now asked us to reconsider whether VA may provide abortion services under any provision of chapter 17 of title 38 of the U.S. Code.

## II.

"We do not lightly depart from our precedents, and we have given the views expressed in our prior opinion careful and respectful consideration." *Reconsidering Whether the Wire Act Applies to Non-Sports Gambling*, 42 Op. O.L.C. 158, 159 (2018) ("*Wire Act*"). But considering "the plain language of the statute," *id.*, we are compelled to conclude that VA may not provide abortions under any provision of chapter 17 of title 38 of the U.S. Code, contrary to the conclusion of our 2022 opinion.

## A.

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Expenditure of Appropriated Funds for Informational Video News Releases*, 28 Op. O.L.C. 109, 119 (2004) (citation omitted). "When the words of a statute are unambiguous, this first canon is also the last." *Transmission of Electoral-College Certificates by "Registered Mail,"* 44 Op. O.L.C. 138, 141 (2020) (cleaned up).

The 2022 interim final rule cannot be reconciled with the VHCA's plain text. As explained above, VA offers medical benefits packages pursuant to its general authority to "furnish hospital care and medical services which the Secretary determines to be needed" for qualified veterans. 38 U.S.C. § 1710(a)(1). "[T]he Secretary has broad discretion to determine the precise hospital or medical services to be supplied." *Abortion Services* at *5 (citation omitted). But that discretion is not limitless. Section 106(a) of the VHCA makes clear that VA may "not" provide "infertility services, abortions, or pregnancy care (including prenatal and delivery care), except for such care relating to a pregnancy that is complicated or in which the risks of complication are increased by a service-connected condition." 106 Stat. at 4947. That language is unambiguous.

Our prior opinion acknowledged this prohibition but evaded its implications. We advised that VA may still provide abortion services "pursuant to its general treatment authority" because section 106's restriction limits

VA's authority only "'under [that] section.'" *Abortion Services* at *7–8 (alteration in original) (citation omitted). But that conclusion did not follow. Section 106 applies whenever VA "furnish[es] hospital care and medical services under chapter 17 of title 38 . . . to women." VHCA § 106(a), 106 Stat. at 4947. VA's general treatment authority— section 1710—falls under chapter 17 of title 38 of the U.S. Code. The "section" at issue in the VHCA—section 106—thus governs VA's general authority to furnish medical care, including under 38 U.S.C. § 1710. So VA cannot invoke its general treatment authority under section 1710 to avoid the VHCA's abortion limitation. In fact, section 106 of the VHCA was codified as a note to section 1710. *See* 106 Stat. at 4947; 38 U.S.C. § 1710 note (1992).

If VA could provide abortions under its general authority to provide medical care, section 106's exclusions would be meaningless. But "Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it." *Fischer v. United States*, 144 S. Ct. 2176, 2184 (2024). After all, "general language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646 (2012) (alteration and citation omitted). The statute before us unambiguously commands that VA may not provide abortions when furnishing medical care under 38 U.S.C. § 1710 or any other provision in chapter 17 of title 38.[3]

---

[3] It is irrelevant that, when section 106 of the VHCA was codified in 1992, section 1710 was only one of the provisions governing VA's medical benefits authority. At the time, section 1712 allowed VA to provide certain ambulatory and outpatient services, whereas section 1710 applied primarily to the provision of hospital, nursing home, and domiciliary care. One could argue that because section 106 was codified as a note after section 1710, its limitation to "this section" could perhaps refer only to section 1710, and that VA could have provided abortions under section 1712. But as we have explained, that is not the best reading of the statute, because "this section" in section 106 most naturally refers to the reproductive health services authorized by section 106. Moreover, Congress in 1996 consolidated section 1712 into section 1710 to create a unified provision for VA's medical benefits authority, and there is no doubt that section 106 limits VA's authority under 38 U.S.C. § 1710. *See* Pub. L. No. 104-262, § 101, 110 Stat. 3177, 3178 (1996). When Congress consolidated those provisions, it did not repeal section 106, confirming that the abortion restriction applies to all hospital care and medical services provided pursuant to chapter 17.

An alternative interpretation of the VHCA would be incongruous with other provisions of federal law, such as those restricting federal employees' activities relating to abortion. *See, e.g.*, 18 U.S.C. § 552; 19 U.S.C. § 1305. It would also "contradict[] decades of Federal policy against forced taxpayer funding for abortion." 90 Fed. Reg. at 36,416. We endeavor to read federal statutes consistently with other federal laws dealing with the same subject, absent indications of congressional intent to the contrary. "'Basic principles of statutory interpretation require' construing statutory provisions 'in harmony,'" not setting statutory provisions at cross-purposes. *Whether Eluding Inspection Under 8 U.S.C. § 1325(a)(2) Is a Continuing Offense*, 49 Op. O.L.C. __, at *8 (June 21, 2025) (quoting *Jones v. Hendrix*, 143 S. Ct. 1857, 1868 (2023)).

Neither can the complicated-pregnancy exception to section 106 of the VHCA be used to justify VA's performance of abortions. *See* VHCA § 106(a)(3), 106 Stat. at 4947 (excluding "infertility services, abortions, or pregnancy care (including prenatal and delivery care), except for such care relating to a pregnancy that is complicated or in which the risks of complication are increased by a service-connected condition"). That exception applies only to pregnancy care, not abortions. To start, the phrase "such care" must refer to pregnancy care, because "such" "refer[s] to the last antecedent." *Black's Law Dictionary* (6th ed. 1990). Moreover, by referring to "such care relating to a pregnancy," the exception tracks the language of the last antecedent—"pregnancy care." The last-antecedent canon instructs that, as here, "a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Lockhart v. United States*, 577 U.S. 347, 351 (2016) (alteration and citation omitted); *accord Wire Act*, 42 Op. O.L.C. at 164–65; Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 144, 152 (2012).

The series-qualifier canon—which teaches that a limiting phrase sometimes applies to an entire list—does not overcome our semantic reading or the last-antecedent's default rule. Although a modifier may sometimes "sweep beyond the nearest referent" when readers are accustomed to applying the modifier to each item, *Wire Act*, 42 Op. O.L.C. at 166, that is not the case here. Applying the "care relating to pregnancy" exception to each of section 106's enumerated exclusions would nonsensically extend an exception about "care relating to a pregnancy that is complicated" to

"infertility services," even though infertility services necessarily precede pregnancy. Nor does the fact that a comma separates the list from the limiting phrase change our conclusion, because the comma merely offsets an "unexpected internal modifier[]." *Id.*; *see also U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) ("No more than isolated words or sentences is punctuation alone a reliable guide for discovery of a statute's meaning.").

Nothing about our interpretation of section 106 undermines VA's authority to provide infertility services or authorized pregnancy care, however. Since enacting section 106, Congress authorized VA to provide infertility services, *see* Pub. L. No. 114-223, § 260, 130 Stat. 857, 897 (2016); approved a medical benefits package that included pregnancy care, *see* Deborah Sampson Act of 2020, Pub. L. No. 116-315, § 5101(b)(1), 134 Stat. 5021, 5022 (2021); created maternity care coordination programs at VA, *see* Pub. L. No. 117-69, 135 Stat. 1495 (2021); and authorized care for newborn children born to women receiving maternity care from VA, *see* 38 U.S.C. § 1786. These later-enacted laws irreconcilably conflict with, and were designed to supersede, the specific prohibitions on those services expressed in section 106 of the VHCA. *See Carcieri v. Salazar*, 555 U.S. 379, 395 (2009) ("[A]n implied repeal will only be found where provisions in two statutes are in 'irreconcilable conflict,' or where the latter Act . . . 'is clearly intended as a substitute.'" (citation omitted)). But none of these authorities supersedes section 106 with respect to abortions—that bar has been unmodified since it was enacted in 1992. And because Congress has shown that it knows how to supplant the prohibitions in section 106, it is implausible that Congress repealed section 106's abortion restriction by mere implication.

## B.

Our 2022 opinion also found support for the 2022 interim final rule in the history of VA's regulations. But to the extent that history is relevant, it reinforces our reading of section 106. "Until 2022, VA had never interpreted its authority under the 1999 extensive revisions to title 38 as allowing abortions." 90 Fed. Reg. at 36,416 n.1. Indeed, "[t]he regulatory determination that abortion is not a 'needed' service for veterans was accepted by every Secretary and Presidential administration for over 20 years." *Id.* at 36,416; *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S.

120, 146 (2000) (noting that the agency at issue had "never asserted [the] authority . . . until it promulgated the regulations at issue"). In 2022, VA for the first time "claimed to discover in a long-extant statute an unheralded power" to provide abortions, *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022) (alteration and citation omitted)—notwithstanding a clear indication that Congress intended to proscribe just that.

Our 2022 opinion tried to blunt the force of this history in two ways. *First*, it observed that "VA did not explain the rationale" behind its exclusion of abortion. *Abortion Services* at *6 (citation omitted). But it would have made little sense for VA to explain why abortions are not medically "needed," 38 U.S.C. § 1710(a)(1)–(3), when section 106 forecloses VA from providing abortion services altogether.

*Second*, we noted that VA "for decades offered general pregnancy care and certain infertility services under its general treatment authority," *Abortion Services* at *7 (cleaned up), even though section 106 proscribes the provision of such services. From that, we concluded that VA had long interpreted section 106 not to limit its general treatment authority under 38 U.S.C. § 1710, and that this interpretation was "entitled to 'considerable weight.'" *Id.* (citation omitted). But this argument, too, cannot overcome the unambiguous text of the statute. After all, "statutes . . . have a single, best meaning." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266–68 (2024). Although "the contemporary and consistent views" of an agency "can provide evidence of the law's meaning," *Bondi v. VanDerStok*, 145 S. Ct. 857, 874 (2025), we may not ascribe great weight to a regulation "that conflicts with the statutory language it purports to implement," *City & County of San Francisco v. EPA*, 145 S. Ct. 704, 720 (2025). That VA previously has offered general pregnancy care and some infertility services under its general treatment authority demonstrates at most that VA sometimes departed from section 106's constraints—not that those constraints do not exist. And as we have explained, the better reading of section 106's text is that VA may not provide abortions pursuant to its general treatment authority.

## C.

The 2022 interim final rule offered two additional bases for why VA could provide certain abortion services under federal law: ratification and implied repeal. Our prior opinion did not expressly invoke these reasons

in defense of its conclusion, but we have considered them for completeness. Neither persuades.

### 1.

The 2022 interim final rule asserted that "Congress has ratified VA's interpretation that section 106 of the VHCA does not limit the medical care that the VA may provide pursuant to its authority under 38 U.S.C. 1710." 87 Fed. Reg. at 55,289. The argument works as follows. Section 106 limited VA's ability to provide "pregnancy care," among other services. *See* VHCA § 106(a)(3), 106 Stat. at 4947. But "general pregnancy and delivery services were included in the medical benefits package when it was established in 1999 pursuant to VA's authority in 38 U.S.C. 1710." 87 Fed. Reg. at 55,289 (citing 38 C.F.R. § 17.38(a)(1)(xiii) (1999)). In the Deborah Sampson Act of 2020, Congress could have—but did not— clarify that VA's provision of pregnancy care was unlawful. Instead, Congress created "a central office" to, among other things, "encourag[e] the activities of the Veterans Health Administration with respect to the provision, evaluation, and improvement of health care services provided to women veterans by the Department." Pub. L. No. 116-315, § 5101(b)(1), 134 Stat. at 5022 (codified at 38 U.S.C. § 7310(b)(1)). And Congress specified that its use of the term "health care" in this context was designed to encompass the services "included in the medical benefits package provided by the Department" as of the date of enactment in early 2021. *Id.* § 5101(b)(2) (codified at 38 U.S.C. § 7310 note). "Given that VA's medical benefits package as of that date included services that were excluded from the coverage of [VHCA's] Section 106"—namely, pregnancy care, the argument goes—"Congress ratified VA's interpretation that it may provide for [abortions] pursuant to its authority under 38 U.SC. 1710, notwithstanding section 106." 87 Fed. Reg. at 55,289.

This argument is a nonstarter. At most, Congress incorporated and authorized the pregnancy care services that VA "included in the medical benefits package" as of January 2021. It did not ratify VA's legal interpretation of section 106 or any purported authority to provide abortion services. To the contrary, the medical benefits package in January 2021 expressly *excluded* abortion services. *See* 38 C.F.R. § 17.38(c) (2019). Because "[a]bortion presents a profound moral issue on which Americans hold sharply conflicting views," *Dobbs v. Jackson Women's Health Org.*,

142 S. Ct. 2228, 2240 (2022), we are especially hesitant to infer from Congress's approval of pregnancy care that it blessed such a capacious and controversial interpretation of VA's treatment authority under 38 U.S.C. § 1710. After all, medical care offered in the medical benefits package is provided only when "needed to promote, preserve, or restore the health of the individual." 38 C.F.R. § 17.38(b). Consistent with the purposes underlying section 106, Congress might reasonably have deemed abortions to be antithetical to the goal of promoting, preserving, or restoring the health of individual veterans. *See, e.g.*, *Dobbs*, 142 S. Ct. at 2284 (acknowledging the government's "legitimate interest[]" in, among other things, "the protection of maternal health and safety" (citations omitted)); *Gonzales v. Carhart*, 550 U.S. 124, 158–59 (2007) (recognizing an interest in preventing the "[s]evere depression and loss of esteem [that] can follow" an abortion). We thus cannot conclude that Congress's approval of pregnancy care in the January 2021 medical benefits package ratified a qualitatively distinct class of services not offered in that package—services relating to abortions. If there is any inference to be drawn from the Deborah Sampson Act, it runs in the opposite direction of our 2022 opinion.

### 2.

The 2022 interim final rule also posited that "[t]he Veterans' Health Care Eligibility Reform Act [of 1996] effectively overtook section 106 of the VHCA." 87 Fed. Reg. at 55,289; *see also* Pub. L. No. 104-262, 110 Stat. 3177 (1996) ("VHCERA"). This argument fails for much the same reason as the congressional ratification argument. VHCERA amended 38 U.S.C. § 1710(a) to establish new eligibility criteria for veterans. *See* VHCERA § 101(a), 110 Stat. at 3178. But it said nothing at all about the abortion limitation in section 106 the VHCA. In fact, VHCERA *did* expressly repeal or amend other provisions of the 1992 Act, but left section 106 untouched. *See id.* § 302(a)(2), 110 Stat. at 3193 (amending section 201 and repealing section 204 of the VHCA); *id.* § 324, 110 Stat. at 3197 (amending sections 107(a) and (b) of the VHCA).

Basic principles of statutory interpretation counsel against reading VHCERA as an implied repeal of VHCA section 106. "When confronted with two Acts of Congress allegedly touching on the same topic," interpreters "must . . . strive 'to give effect to both.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (citation omitted). In such a situation, "we come

armed with the strong presumption that repeals by implication are disfavored and that Congress will specifically address pre-existing law when it wishes to suspend its normal operations in a later statute." *Id.* (cleaned up); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 240 (2009) (requiring "a clear expression . . . of Congress' intent to repeal" before concluding that a provision has been repealed by implication). That presumption carries substantial force here. Abortion is deeply controversial, *see Dobbs*, 142 S. Ct. at 2240, so we would not expect Congress to "use oblique or elliptical language to empower" VA to provide abortion services in the face of VHCA's clear prohibition, *West Virginia*, 142 S. Ct. at 2609.

## III.

"We do not depart from our past views lightly." *Reconsidering the Application of the Hyde Amendment to the Provision of Transportation for Women Seeking Abortions*, 49 Op. O.L.C. __, at *17 (July 11, 2025). But after careful consideration, we think it appropriate to do so here. "[A]s with any system of precedent, reconsideration of our prior opinions is appropriate where, for example, we have identified errors in the supporting legal reasoning." *Id.* (cleaned up); *see also Wire Act*, 42 Op. O.L.C. at 178; *id.* at 178 n.15 (collecting examples). We have described already the legal errors in our 2022 opinion, and the reasoning with which we disagree was conspicuously shallow in its attention to the text and scope of section 106, among other flaws. Further, the magnitude of any reliance interests vis-à-vis our 2022 opinion is minimal. That opinion "is of relatively recent vintage," and it "departed from established [VA] practice"—spanning decades—of not providing abortion services. *Wire Act*, 42 Op. O.L.C. at 179. Restoring the status quo ante will not be unnecessarily destabilizing. "We acknowledge that some may have relied on the views expressed in our" previous opinion, but "in light of our conclusion about the plain language of the statute, we do not believe that such reliance interests are sufficient to justify continued adherence" to that decision. *Id.* at 180.[4]

---

[4] Government officers and employees may have relied upon our prior advice when providing abortions, notwithstanding contrary state law. We note that "[t]he Constitution's Supremacy Clause generally immunizes the Federal Government from state laws that directly regulate or discriminate against it." *United States v. Washington*, 142 S. Ct.

VA may not provide abortion services under any provision of chapter 17 of title 38, including 38 U.S.C. § 1710. Because the statutory scheme supporting the provision of care to CHAMPVA beneficiaries is also part of chapter 17, the same rule applies to the CHAMPVA program. *See* 38 U.S.C. § 1781(b). The portions of our opinion in *Abortion Services* that advised otherwise are hereby withdrawn and superseded by this opinion.

JOSHUA J. CRADDOCK
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

1976, 1982 (2022). And the entrapment-by-estoppel defense "applies to a defendant who reasonably relies on the assurance of a government official that specified conduct will not violate the law." *United States v. Votrobek*, 847 F.3d 1335, 1344 (11th Cir. 2017) (citation omitted); *accord United States v. Miles*, 748 F.3d 485, 489 (2d Cir. 2014). These doctrines ensure that when this Office reasonably advises an officer or employee that his conduct is immune from state regulation and he reasonably relies on that legal advice, that employee generally will remain immune from state-law liability, even if the advice is later found to be erroneous. Although we believe our earlier opinion's analysis of VA's statutory authority was erroneous, our withdrawal of that opinion in relevant part does not upset these reliance interests.